### SHOEMAKER et al. v. HUNTINGTON.

(Court of Appeals of District of Columbia. Submitted November 21, 1921. Decided January 3, 1922.)

#### No. 1432.

1. Patents ☞91(3)—Applicant, after patent has issued to another, must prove priority beyond a reasonable doubt.

An applicant for patent, whose application was not filed until a patent for the same invention had already issued to another, is required to establish his claim to priority beyond a reasonable doubt.

2. Patents ☞91(4)—Junior applicant held not to have shown prior invention.

In interference proceedings between patentees and a junior applicant, whose application was not filed until the patent had issued, evidence held not to establish priority of invention by the junior applicant, who had, between the date of his claimed invention and the date of his application, filed another application, which did not cover the invention in issue.

Appeal from the Commissioner of Patents.

Interference proceedings between John H. Shoemaker and Henry Bruck, patentees, and Henry C. Huntington, junior applicant. From a decision awarding priority of invention to the junior applicant, the patentees appeal. Reversed, and priority awarded to appellants.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

D. P. Wolhaupter, of Washington, D. C., for appellants.
T. J. Geisler, of Portland, Or., for appellee.

ROBB, Associate Justice. Appeal from a decision of the Patent Office in an interference proceeding in which priority of invention was awarded the party, Huntington, whose application was not filed until after the issuance of a patent to Shoemaker and Bruck. The invention, though simple, is very useful, and relates to rubber shoe taps or half soles, with a shank edge reinforced by a fabric strip to prevent withdrawal of the nails. The first and second of the four counts sufficiently illustrate it and are here reproduced:

"1. A shoe tap having upper and lower thicknesses of fibrous, reinforced material embedded in the rear edge portion thereof, said thicknesses being separated from each other so as not to form a double thickness.

"2. A shoe tap including a composition body and a fabric strip extending throughout the width of the body at the back edge thereof, said strip being completely housed within the tap and being folded longitudinally to form spaced plies."

[1] The Examiner of Interferences, who found for the appellants, carefully reviewed the evidence, and we therefore shall do little more than state our conclusions. In the first place, Huntington was required to establish his claim to priority beyond a reasonable doubt, as all the tribunals recognized. All the tribunals also recognized that Shoemaker and Bruck, prior to the entry of Huntington into the field, "had the idea broadly of reinforcing the half sole on the rear edge thereof" (Assistant Commissioner's decision). Appellants were practical men in this art, operating, as they did, one of the largest shoe repair establishments on the Pacific Coast. Appreciating the necessity for a device of this kind, they set to work to design one. The witness Mastick, whom all the tribunals found to be disinterested and truthful, and who was skilled in the art, testified that in the spring of 1916 Mr. Shoemaker explained to him that he and Bruck proposed to overcome the trouble resulting from the failure of nails to hold in the rubber half sole by putting "a piece of canvas in there, in between the sole, that would hold the nails." This was long prior to Huntington's entry into the field. Later, according to Mr. Mastick, Shoemaker showed him a completed sole, and, when asked who made it, replied that—

"The Portland people [Huntington's concern] made it, and then after that he told me that he had received his patent."

The two higher tribunals of the Patent Office criticized this testimony, because Mastick did not say that the disclosure to him showed that a folded piece of fabric was used. While the witness did not state just how the fabric was used, the later declaration by Shoemaker that he had received his patent indicates very clearly that the early structure and the patent structure were one and the same. However, the statements of another disinterested and reliable witness, a Mr. Goldsmith, were more specific on this point—in September of 1916, at the Shoemaker and Bruck establishment, although not in their employ when he testified. Between the middle of September and the first of October of that year Mr. Shoemaker told him he was having a pair

of soles made "with a folded piece of canvas in the end and they would hold; that is, he thought they would hold." Later he saw the soles alluded to by the witness Mastick, and, when asked whether Shoemaker had informed him how they were made, said:

"Yes; he did. He said that they were made with a piece of folded canvas in the end of the sole."

On cross-examination he was asked:

"What kind of material did Mr. Shoemaker or Mr. Bruck tell you was to be put in the shank edge?"

And he replied:

"Mr. Bruck never told me anything. Mr. Shoemaker told me."

Then followed these questions and replies:

"Q. What did he tell you? A. He said a piece of canvas folded.
"Q. Didn't he tell you how it was going to be put in there? A. He said a folded piece of canvas on the edge; that is all he told me."

These soles were put on a pair of shoes, and were worn by Shoemaker continuously for more than six months. Being satisfied, then, that the invention was practical, appellants, on April 17, 1917, filed their application, upon which a patent was granted September 11th following.

Mr. Huntington manufactured and sold certain products, including rubber heels for shoes, and appellants purchased supplies from him. In his preliminary statement he says he conceived, disclosed, and reduced the invention to practice about November 1, 1916, and his earliest activity, under the evidence, commenced after the middle of October of that year. Under the view we take of the case, we deem it unnecessary to consider the contention of Shoemaker and Bruck that Huntington derived the invention from them.

[2] About two months after Mr. Huntington claims to have reduced this invention to practice, he filed an application for a patent on a composition sole with a reinforced shank edge, which admittedly did not disclose the invention of the issue. He is an intelligent man, yet he has given no satisfactory explanation as to why, if he then thought himself the inventor of the subject-matter of this interference, he did not claim it. Stress is laid by the higher tribunals of the Patent Office upon the fact that, during the pendency of appellants' application in the Patent Office, Huntington refused to supply them with soles of the issue, and Huntington insists that, even prior to the date of the Shoemaker and Bruck application, he was making a sole bearing the words "Pat. Applied for," and that appellants made no protest.

As to the first point, appellants well may have concluded that, until their patent issued, their safer course would be to purchase these soles from jobbers, as other repair men were required to do. As to the second point, the Patent Office has entirely overlooked the significant fact that no patent was applied for on this invention until two months after appellants' patent issued. The words "Pat. Applied for," therefore, obviously referred to the application Huntington did file one

month after he claims to have made this invention, but which, as we have seen, did not cover it.

Without further discussion of the evidence, we are clearly of the view that Huntington has not sustained the heavy burden resting upon him, and therefore reverse the decision appealed from, and award priority to Shoemaker and Bruck.

Reversed.